IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

IN RE LETTER OF REQUEST     )
FROM LATVIA                 )
IN THE MATTER OF            )     Misc. No. 06-
TIBAVA, LTD.                )

**GOVERNMENT'S MEMORANDUM OF LAW
IN SUPPORT OF APPLICATION FOR ORDER**

This memorandum of law is submitted in support of the Application for an Order pursuant to Title 28, United States Code, Section 1782, in order to execute a letter of request from Latvia. A copy of the translation is attached.

FACTUAL BACKGROUND:

This investigation is being conducted by the Latvian authorities who are investigating a case of alleged customs violations.

EVIDENCE SOUGHT:

The Latvian authorities seek information from the Delaware Secretary of State's Office and a company in this District. The authority for this Court to accede to this request is contained in Title 28, United States Code, Section 1782, which states in part:

> (a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other

thing be produced, before a person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

The proper criteria for determining whether the court should exercise its discretion in favor of executing the request are outlined in *In Re Request for Judicial Assistance from the Seoul District Criminal Court*, 555 F.2d 720, 723 (9th Cir. 1977) (citation omitted):

> Under the statute the only restrictions explicitly stated are that the request be made by a foreign or international tribunal, and that the testimony or material requested be for use in a proceeding in such a tribunal.... [and] that the investigation in connection with which the request is made must relate to a judicial or quasi-judicial controversy.

Moreover, "(t)he judicial proceeding for which assistance is sought ... need not be pending at the time of the request for assistance; it suffices that the proceeding in the foreign tribunal and its contours be in reasonable contemplation when the request is made." *In Re Letter of Request from the Crown Prosecution Services of the United Kingdom*, 870 F.2d 686, 687 (D.C. Cir. 1989).

The letter of request in this case shows that the information sought is for use in such proceedings in Latvia and

hence the request comes well within those circumstances contemplated by Congress in expanding the Federal Courts' authority to act in such matters. *In Re Letter of Request from the Crown Prosecution Service of the United Kingdom*, 870 F.2d 686, 689-91 (D.C. Cir. 1989); *In Re Letters Rogatory from the Tokyo District, Tokyo, Japan*, 539 F.2d 1216, 1219 (9th Cir. 1976). Therefore, I ask this Court to honor the request for assistance.

The reception of letters of request and the appointment of a Commissioner to execute them are matters customarily handled <u>ex parte,</u> and persons with objections to the request raise those objections by moving to quash any subpoenas issued by the Commissioner. *Id.*

**WHEREFORE**, the United States requests that the Court issue an Order, in the form, appended hereto, appointing a Commissioner in order to execute the request for assistance.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

BY: /s/ Richard G. Andrews
Richard G. Andrews
Assistant U.S. Attorney
Delaware Bar I.D. No.2199
1007 Orange Street
Wilmington, DE  19801
(302) 573-6277

Dated: 7/25/06



LATVIJAS REPUBLIKAS PROKURATŪRA

# ĢENERĀLPROKURATŪRA

Reģ.Nr. 90000022859, Kalpaka bulvārī 6, Rīgā, LV-1801
tālr. 7044400, fakss 7044449, e-pasts: gen@lrp.gov.lv

RIGA

May " 3 ", 2006
Our ref.: 1/1-10-45-06
(please repeat when responding)

Office of International Affairs
Criminal Division
United States Department of Justice
Washington, D. C. 20530

Subject: **Mutual Legal Assistance Request**

Enclosures: Request for Assistance No.20.1/77/624 of April 4, 2006
in Criminal Case No.11990000505
made by the Customs Criminal Board
of the State Revenue Service
(accompanied by translation from Latvian into English)

Dear Madam or Sir,

  The Central Authority of the Republic of Latvia with reference to the *Treaty Between the Government of the United States of America and the Government of the Republic of Latvia on Mutual Legal Assistance in Criminal Matters* of June 13, 1997 has the honor of requesting assistance.
  You are kindly requested to intercede with the appropriate authorities in order to execute the enclosed request.
  Please notify us about the outcome. Thank you in advance for your cooperation with this request.

Yours faithfully,

Prosecutor General of the Republic of Latvia          Janis Maizitis

*Translated from Latvian*

# CUSTOMS CRIMINAL BOARD
## THE REPUBLIC OF LATVIA
### STATE REVENUE SERVICE

6 Eksporta Street, Riga, Latvia, LV-1010, Telephone: +371-7357201, Fax: +371-7357202, +371-7357222

Riga

04.04.2006.         No.20.1/77/624

To: Law Enforcement Institutions
of the United States of America

On Rendering of Legal Assistance

Customs Criminal Board of the Republic of Latvia State Revenue Service (hereinafter referred to as SRS) has initiated the criminal procedure No. 11990000505 in accordance with crime indications provided for in Section 2 Article 73 of the Republic of Latvia Criminal Law, for smuggling of 2599697 kg of A-76 grade gasoline at the amount of LVL 233972,72 on 26 August 1997; 5000000 kg of 95E grade gasoline at the amount of LVL 500000 on 16 November 1997, and 24779 kg of 95E grade gasoline at the amount of LVL 2447,90 on 20 November 1997, using forged customs and other documents within a group of persons under a prior agreement, at a large amount, against unidentified persons.

### Article 73 of the Criminal Law of Latvia
### Smuggling

For smuggling, that is, for illegal transfer of goods or other values across the Republic of Latvia customs border by eluding customs examination or hiding goods or other values from such examination, or by using forged customs or other documents, if committed in large quantities,
- a sentence of up to five years of imprisonment or a fine of up to one hundred minimum monthly wages, with or without property forfeiture is imposed.
For smuggling, if committed by a group of persons under a prior agreement, as well as for smuggling of drugs, psychotropic or poisonous substances and agents or goods, products or technologies of strategic value
- a sentence of up to ten years of imprisonment, with property forfeiture, and placement under police control for the time of up to 3 years or without it is imposed.

### The following facts have been clarified during pre-trial investigation:

It was clarified during investigation that on 26 August, on 16 November and on 20 November 1997 director of the company "Tibava" Ltd., registration No. ███████, legal address Dzirnavu iela 2, Riga, Ruslans Skribans, identity number ███████, processed customs declarations SAD IM-4 No. 0207/07 – 000006413, SAD IM-4 No. 0207/07 – 000006411, SAD IM-4 No. 0207/07 – 000006418 at customs checkpoint Šķirotava. Upon processing of the above customs declarations R. Skribans submitted to the customs office a

forged resolution No. 0196/5.3.1-5/915-1013 of 9 July 1997 by SRS Riga Northern district office on prolongation of the term of tax payment in order to evade taxation and import in the customs territory of the Republic of Latvia by smuggling 3000 tons of A-76 grade petrol at the total customs value of LVL 554748.

On 16 November 1997 and on 20 November 1997 upon processing of the customs declarations SAD IM-4 No. 0234/07 – 000005024 and SAD IM-4 No. 0234/07 – 000005177 at customs checkpoint "BLB Baltijas terminals" R. Skribans submitted to the customs office a forged resolution No. 0196/5.3.1-5/415-1413 of 31 October 1997 by SRS Riga Northern district office on prolongation of the term of tax payment for the period of 3 months, endows him with rights to import goods in the customs territory of the Republic of Latvia without paying taxes since the term for tax payment is considered to be prolonged. As a result 5024,779 tons of BE-95E grade petrol at the total customs value of LVL 1047201 were transferred across the Republic of Latvia customs border.

Upon verification of the fact of deferred payments issue at SRS Riga Northern district office it was realized, that no prolongation of the term for tax payment has been granted to "Tibava" Ltd.

Illegally imported petroleum products were sold to companies "Ljuvena" Ltd. and "Klangu kalns" Ltd. The money received from the sale of petrol was transferred to the account ▇▇▇▇▇▇ of "Tibava" Ltd. at the joint-stock company "Saules banka".

In accordance with agreement No. 901/97 of 13 November 1997 the company "Tibava" Ltd. purchased the petroleum products from the US company "Dinaz Oil Terminal", Willow Grove Road, Bldg 2, Camden, Delaware, country of Kent, USA.

In the time period from 2 September 1997 until 10 December 1997 Marina Smolkova, identity number 021069-10539, using the stolen passport of Tatjana Kovalova filled in checks in the name of T. Kovalova for the purpose of drawing money at the amount of LVL 62454 and USD 3714700 from the account No. ▇▇▇▇▇▇ of "Tibava" Ltd. at the joint stock company "Saules banka".

Ruslans Skribans, identity number ▇▇▇▇▇▇, director of the company "Tibava" Ltd., who was examined as a witness, testified that an acquaintance named Olegs had offered him to become the director of "Tibava" Ltd. Upon request by Olegs he on 26 August 1997, on 16 November 1997 and on 20 November 1997 carried out customs clearance in respect of petrol cargos at the customs office. All the necessary documents, including the resolutions by SRS Riga Northern district office on prolongation of the term of tax payment were given to him by Olegs.

According to testimonies by witnesses the following, for the present unidentified persons have taken part in petroleum products import and sale related operations in the name of "Tibava" Ltd.: Saša, Roberts, Mareks, Romāns.

On the ground of the above mentioned, in order to contribute to pre-trial investigation, to clarify the circumstances under which the petroleum products were imported in the Republic of Latvia and, on a legal basis to obtain the evidence necessary for criminal procedure, we kindly ask you to perform the following investigation and other activities in the USA:

- To find out whether the company "Dinaz Oil Terminal", Willow Grove Road, Bldg 2, Camden, Delaware, country of Kent, USA has been registered as a taxpayer in the USA;
- If the company has been (was) registered in the USA, we kindly ask you to examine as witnesses its competent officials in charge on the following:
- Since when and in what position he/she works in the company "Dinaz Oil Terminal";
- What his/her job responsibilities are;
- Type of business the company is engaged in;

- Whether their company on 13 November 1997 concluded the agreement No. 901/97 with the Latvian company "Tibava" Ltd., registration No. ████████, legal address Dzirnavu iela 2, Riga, on the sale of petrol;
- If agreement was concluded, who out of their company's employees dealt with conclusion of the above mentioned agreement; Describe the procedure of agreement conclusion and payment for petrol; Please, present certified copies of respective documents;
- Whether "Tibava" Ltd. made money transfers to "Dinaz Oil Terminal" for purchase of petroleum products in the time period from August 1997 until December 1997;
- Whether they know the following persons of the Republic of Latvia: Oļegs, Saša, Roberts, Mareks and Romāns;
- Whether any transactions have been performed and communication has taken place with the above mentioned persons; If there have been any, specify the transaction and how the communication took place;
- We kindly ask you to provide all the information known to you – first names, surnames, company's name, registration number, address, telephone and fax numbers, bank accounts, vehicle state identification/registration numbers, mutual acquaintances, etc., - in respect of all the persons and companies who *de facto* ordered and paid for purchase of the petrol cargos;
- We kindly ask you to provide certified copies of all the documents, including agreements, invoices/bills, specifications, payment documents etc., which are related to payment for petrol.

Annex: Agreement No. 901/97 of 13 November 1997, on 4 pages.

Thank you for cooperation.

Very truly yours,

Deputy Director        (signature)        Ē. Zaļenieks

Kaksītis 7357213

<u>Agreement No. 901/97</u>

"13" November 1997

This Agreement is made by and between

"DINAZ Oil Terminal" (hereinafter referred to as the "Seller") represented by its Director *Dorsi F.*, who acts in compliance with Articles of Association on one side,

and

the company "TIBAVA" (hereinafter referred to as the "Customer") represented by its Director Skribans, on the other side. The Parties hereto agree as follows:

**1. Subject of the Agreement**

1.1. The Seller hereby undertakes to sell, but the Customer hereby undertakes to buy petroleum products (hereinafter referred to as the Product) at the amount and prices stated in Annex to this agreement;
1.2. Quality of the Product is prescribed by a quality certificate. Package of the Product is a tanker.
1.3. The Product shall be delivered under delivery terms FOB Riga, in accordance with regulations Incoterms, in the wording of 1990;
1.4. The price and sum of the agreement is stated in Annex and is subject to approval by both the parties on a monthly basis.

**2. Shipment of the Product**

2.1. Shipment of the Product takes place by pouring it into tankers;
2.2. Delivery schedule is approved by both the parties in addition;
2.3. Quantity of the Product supplied under the agreement is stated in Annex +/-10% and is approved by both the parties on a monthly basis.

**3. Quality of the Product**

3.1. Quality of the Product under sale shall comply with prescribed standards and technical conditions, and is verified by a certificate-passport of quality.

**4. Conditions of Payment**

4.1. Value of the consignment supplied under the present agreement shall be paid in accordance with Annex.

**5. Transfer and Acceptance of the Product**

5.1. Ownership in respect of the Product as well as risks of its accidental loss are transferred from the Seller to the Buyer at the moment of crossing the border of the state indicated by the Buyer;
5.2. Upon acceptance of the Product a shortage within the limits of 1% (according to tanker standards) is allowed providing the seals of the manufacturer are undamaged. In this case

weight of the Product is considered to be accepted by documents and no claims of shortage are accepted by the Seller;

5.3. If the Buyer does not accept the Product or its part due to his fault at the sending station, the Seller notifies the Buyer in writing about arrival of the product and stores the Product at railway stations of the Buyer. In this case the Buyer covers all the costs related to extra storage, transportation and sale of the Product and undertakes all the risks related to loss and damage of the Product;

5.4. In case of disputes related to quality of the Product under supply a test of samples taken at the destination point is executed in a neutral laboratory co-coordinated by both the parties, using the methods of analysis existing in the country of petroleum products manufacturer. Results of such analysis shall be final and binding to both the parties.

## 6. Obligations of the Seller

6.1. Ensure delivery of the Product under delivery terms FOB Riga, following the schedule of delivery stated in Annex;

6.2. Notify the Buyer by fax within 24 hours since shipment of the Product about shipment of the Product, specifying the following information: No. of agreement; name of product; quantity; value; date of shipment; No. of tanker; No. and date of bill of lading.

## 7. Obligations of the Buyer

7.1. Pay the value of the Product in accordance with the existing agreement;

7.2. Immediately execute acceptance of the Product in accordance with section 5 as soon as it is committed to the care of the Buyer;

7.3. Undertake all the risks related to loss or damage of the Product from the moment it was delivered to the place stated in the agreement under delivery terms FOB Riga;

7.4. Pay all the duties, taxes and cover other official costs, as well as the fee for completion of the customs formalities upon import in the country stated by the Buyer, and all the expenses for further transportation of the Product.

## 8. Force Majeure

8.1. If as a result of any events, such as fire, natural disasters, war, military and other operations, blockade, governmental rule or measures of proscriptive nature or other force majeure events beyond the control of either party the parties are prevented from total or partial performing any of their obligations under the agreement, the term of fulfillment of the obligations under the agreement shall be postponed for the time period the above circumstances exist.

8.2. If the force majeure continues for more than two months, either party shall be entitled to repudiate the agreement. In this case neither party shall be entitled to claim indemnification of losses;

8.3. The party which finds it impossible to further perform obligations under the agreement shall notify the other party of commencement and termination of the circumstances stated in paragraph 9.1 not later than within 10 calendar days.

## 9. Dispute Settlement

9.1. The Seller and the Buyer shall try their utmost to settle any disputes which may arise upon completion of this agreement or out of it, in discussions or negotiations between the parties;

9.2. In case the disputes cannot be settled in discussions or negotiations between the parties, they shall be settled by arbitration.

**10. Miscellaneous provisions**

10.1. Neither party shall be entitled to transfer its rights and obligations under this agreement to the third party without written consent of the other party;

10.2. All the modifications and supplements to this agreement shall be considered valid only if they are executed in writing and bear the signatures and seals of both the parties;

10.3. This agreement cancels all prior correspondence and discussions, which shall be considered invalid;

10.4. This agreement is valid until 31 December 1997. The agreement can be prolonged under the same conditions, with a written consent by both the parties;

10.5. The agreement becomes effective upon signing by both the parties;

10.6. The agreement is executed in the Russian language in two counterparts, one for each party. Each of the counterparts has equal legal force.

**11. Legal Addresses of the Parties**

| The Seller | The Buyer |
|---|---|
| "DINAZ OIL Terminal" | Company "TIBAVA", Latvia, |
| UNITED OVERSEAS BANK | Rīga, Dzirnavu iela 2, 3rd Floor |
| Geneva, Account No ███ | "PAREX BANK" |
| Dinaz Oil Terminal | Bank account ███ |
| BANQUE NATIONAL de PARIS | |
| NEW YORK, | |
| SWIFT: ███ | Reg. number ███ |
| Acc. No. ███ | Smilšu 3 |
| | Corresp. account at the Bank of Latvia ███ |
| | Code ███ |
| | Telephone ███ |
| Director | Director |
| *DORSI F.* | *SKRIBANS* |
| (seal) (signature) | (seal) (signature) |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

IN RE LETTER OF REQUEST    )
FROM LATVIA                )
IN THE MATTER OF           )  Misc No. 06-
TIBAVA, LTD.               )
                           )

ORDER

Upon application of the United States of America; and upon examination of a letter of request from Latvia whose authorities are seeking certain testimony and information from individuals which may be found in this District, for use in a judicial proceeding in Latvia and the Court being fully informed in the premises, it is hereby

**ORDERED**, pursuant to Title 28, United States Code, Section 1782, that Richard G. Andrews, Assistant United States Attorney, hereby is appointed as Commissioner of this Court and is hereby directed to execute the letter of request from the Latvian authorities as follows:

1. to take such steps as are necessary, including issuance of commissioner's subpoenas to be served on persons within the jurisdiction of this Court, to collect the evidence requested;

2. provide notice with respect to the collection of evidence to those persons identified in the requests as parties to whom notice should be given (and no notice to any other party shall be required);

3. adopt procedures to collect the evidence requested

consistent with its use as evidence in a proceeding before a Court in Latvia, which procedures may be specified in the request or provided by the Latvian authorities;

   4. seek such further orders of this Court as may be necessary to execute this request; and

   5. certify and submit the evidence collected to the Office of International Affairs, Criminal Division, United States Department of Justice, or as otherwise directed by that office for transmission to the Latvian authorities.

   IT IS FURTHER ORDERED that, in collecting the evidence requested, the Commissioner may be accompanied by persons whose presence or participation is authorized by the Commissioner.

   Dated: This _____ day of _____, 2006.

_____
United States District Court Judge